**EXHIBIT A**

A.C.T. INTERNATIONAL APPAREL GROUP INC.

STOCK PURCHASE AGREEMENT

AND

SHAREHOLDERS AGREEMENT

DATED

MARCH 12, 2007

| Document | Exhibit Number |
|---|---|
| | |
| Stock Purchase Agreement by and among Norman Moore, Sha Li, A.C.T. International Apparel Group Inc. ("Sellers") and Karan Singh ("Buyer") | 1 |
| A.C.T. International Group, Inc. Shareholders Agreement | 2 |
| A.C.T. International Group, Inc. Unanimous Written Consent of the Shareholders and Directors | 3 |

## STOCK PURCHASE AGREEMENT

This Stock Purchase Agreement (the "Agreement") dated March 12, 2007 between Norman Moore, residing at 11451 Fallow Deer Court, Fort Meyers, Florida 33966 (hereafter referred to as Norman), Sha Li, residing at 24 Warren Street, Plainsboro, New Jersey 08536 (hereafter referred to as Sha (Norman and Sha collectively may be referred to as the "Shareholders"), A.C.T. International Apparel Group, Inc., having a place of business at 180 Madison Avenue, 20th Floor, New York, New York 10018 (referred to herein as the "Seller" and/or the "Company") and Karan Singh, residing at 31 Amber Lane, Oyster Bay, New York 11771 (the "Buyer").

### WITNESSETH :

WHEREAS, Buyer is desirous of purchasing one thousand (1000) shares of common stock of the Company, and Seller is desirous of selling one thousand (1000) shares of the same (hereafter the "Shares"); and

WHEREAS, there are currently issued and outstanding two thousand shares of the Company's common stock; and

WHEREAS, the Seller wishes to sell, and Buyer wishes to buy the Shares.

NOW, THEREFORE, in consideration of mutual covenants hereinafter set forth, the parties hereto do agree as follows:

1.    <u>Sale of the Shares of the Seller</u>.  On the terms and subject to the conditions herein set forth, on the Closing Date the Seller shall sell, transfer, assign and deliver to Buyer, and the Buyer shall purchase, the Shares from Seller, in each case free and clear of all liens, claims, encumbrances, pledges, charges, security interests, title retention agreements, adverse claims, options or equities of every kind whatsoever. At the closing, the Seller shall deliver to the Buyer appropriate certificates representing the Shares duly endorsed in blank or accompanied by stock powers or other instruments of transfer duly executed in blank, and shall have annexed thereto all necessary stock transfer stamps or shall deliver funds sufficient for the purchase thereof. Notwithstanding anything in this Agreement to the contrary, Buyer shall not be obligated to purchase any of the Shares unless and until the Seller deliver certificates evidencing all of the Shares.

2.    <u>Consideration</u>.

2.1    The aggregate purchase price to be paid to the Seller for the Shares shall be Three Hundred Thousand Dollars ($300,000.00), which will be paid at the Closing by certified checks, bank checks or cashier's checks made payable to the Seller against delivery of the certificates for the Shares. In addition at Closing the Buyer and the Shareholders shall enter and execute a Shareholders Agreement whereby the parties will agree to the management of the Company.

3.    <u>Representations and Warranties of the Seller and Shareholders</u>. Seller and Shareholders, jointly and severally represent and warrant to the Buyer as follows:

3.1    <u>Organization and standing of the Company</u>. The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of New Jersey and has all requisite corporate power and authority to carry on its business as currently conducted and to own or lease and to operate its properties and assets as and where such properties and assets are now owned or leased and operated. The Company is authorized to do business and in good standing in the States of New York and Florida and any other jurisdictions where being authorized and in good standing is necessary for the Company to conduct its business.

3.2    <u>Capitalization</u>. The authorized capital stock of the Company consists of three thousand shares of Common Stock, of which two thousand shares are issued and are outstanding. All of the issued and outstanding shares are duly authorized, validly issued, fully paid and non-assessable, with no liability whatsoever attaching to the ownership thereof. The Shares being purchased hereunder constitute 33% of the issued and out standing capital stock of the Company. There are no subscriptions, options, warrants, calls or rights of any kind to purchase or otherwise acquire, or plans, contracts or commitments providing for the issuance of, or the granting of rights to acquire, and no securities convertible into, or exchangeable for, capital stock of the Company.

3.3    <u>Title to Shares, Capacity etc</u>.

(a)    With respect to all of the Shares to be sold to the Buyer pursuant to this Agreement the Seller has the full legal right, power and authority to sell, assign, transfer and deliver the Shares. Upon delivery of the consideration for the Shares at the Closing as provided in Section 2.1 hereof, Buyer will acquire good and marketable title to the Shares, free and clear of all liens, pledges, charges, security interests, encumbrances, community property rights, title retention agreements, restrictions on transfer or voting, claims, options or equities or other defects of title of any kind whatsoever.

(b)    The execution and delivery of this Agreement and the sale of the Shares to be sold by the Seller hereunder will not conflict with or result in a breach of any of the terms or provisions of any Shareholders agreement, voting trust, indenture, mortgage, lease, bond, note, debenture, guaranty, deed of trust or other agreement, instrument or arrangement to which the Seller may be or is a party (including by operation of law) or by which its property is bound, or any law, administrative regulation, or any order of any court or governmental agency or authority entered in any proceeding to which the Seller was or is a party or by which its property is bound.

(c)    There are no actions, suits, legal or governmental proceedings pending or threatened or relating to this Agreement or the transactions described herein.

(d)    The Seller or Shareholders have not utilized a finder or other

person acting in a similar capacity with respect to the transactions contemplated by this Agreement.

(e)     The Seller have duly and irrevocably authorized, executed and delivered this Agreement and any other document necessary to effect the transactions contemplated hereby, and this Agreement and each such document constitutes the legal, valid and binding agreements of the Seller, enforceable in accordance with its terms.

3.4     No Subsidiaries. The Company does not own, directly or indirectly, any interest in or control any other corporation, association or business organization and the Company does not own, directly or indirectly, capital stock of any corporation, nor any equity or ownership interest or other interest in any other business or entity.

3.5     Consents. Except as set forth in Schedule 3.5, no consent, license, approval, order, or authorization of, or registration, filing or declaration with, any governmental authority is required to be obtained or made prior to or after the Closing, and no consent of any third party (including, but not limited to, any financial institution, mortgagor, landlord, or lessor) is required to be obtained by the Seller or the Shareholders in connection with the execution, delivery and performance of this Agreement or the transactions contemplated hereby.

3.6     Financial Statements.

(a)     Attached hereto as Exhibit 3.6(a) are the compiled financial statements of the Company as of December 31, 2006 (the "Financial Statements"). The Financial Statements have been accurately prepared from the books and records of the Company in accordance with generally accepted accounting principles, applied on a consistent basis, and fairly present the financial position of the Company as at the dates thereof and the results of operations for the periods covered thereby.

(b)     No Adverse Change. Except as set forth on Schedule 3.6(b), since December 31, 2006, there has been no material adverse change in the assets, liabilities, business, prospects, financial condition, results of operations or in the properties or assets of the Company. Since December 31, 2006, neither the business nor properties of the Company have sustained any damage, destruction or loss, whether or not covered by insurance, which has adversely affected or impaired or which does adversely affect or impair its ability to conduct its business.

(c)     Absence of Undisclosed Liabilities. Except for liabilities and obligations disclosed on Schedule 3.6(c), or expressly permitted by this Agreement, the Company has no liabilities or obligations whatsoever, whether absolute, accrued, contingent or otherwise.

3.7     Title to Assets. The Company has good and marketable title to all its properties and assets, whether or not reflected on the Financial Statements or acquired after the date thereof, free and clear of all Liens, except those set forth on Schedule 3.7. As used in this section, the term "Lien" means any mortgage, pledge, security interest, lien, claim, encumbrance, or charge of any kind.

3.8    <u>Leases and Licensing Agreements.</u>  The Company is not a party to any lease of real or personal property, nor is it a party to any licensing or royalty agreements except as those set forth on Schedule 3.8.

3.9    <u>Litigation.</u>  Except as disclosed on Schedule 3.9, there are no actions, lawsuits, proceedings, investigations or inquiries pending, threatened, against or affecting the Company, its properties or assets or the conduct of its business. There are no violations, citations, fines, injunctions or penalties heretofore asserted against or imposed on the Company, its properties or assets or with respect to the conduct of its business under any federal, state or local law relating to any matter to occupational health or safety or of which the Company has received notice or which otherwise bind the properties or assets of the Company and, to the best knowledge of the Seller, none has been threatened.

3.10    <u>Trademarks and Trade Names, etc.</u>  Schedule 3.10 sets forth a true and correct list of all trademarks, service marks, trade names and copyrights (and applications therefor), in all jurisdictions in which such registrations or applications have been filed, together with all registration and application numbers therefor, if any, heretofore or currently used in connection with the business of the Company. Each such trademark, service mark, trade name and copyright (and application therefor) is owned by the Company and is not subject to any license, royalty arrangement, dispute, lien, claim or encumbrance. The Company has not received any notification of infringement by it or any claims with regard to any trademark, service mark or trade name from any person, and the Seller are not aware of a basis for any such claim. No trademark, service mark or trade name used by the Company infringes any trade mark, service mark or trade name or others in any country in which such trademark, service mark or trade name is used. No stockholder, officer, director or employee of the Company owns or has any interest in any trademark, service mark, trade name, copyright or application therefor or trade secret, if any, used by the Company in connection with its business.

3.11    <u>Compliance with Other Instruments and Laws.</u>  The Company is not in violation of, or in default under, any term of any contract, mortgage, indenture, instrument or agreement to which it is a party or in violation of its certificate of incorporation, by-laws or other governing instrument, or any judgment, ruling, decree or order which names the Company or to which it is a party, or by which its assets are bound, or any injunction to which any is subject. The Company is holder of all such permits, concessions, grants, franchises, licenses or other governmental authorizations or approvals as are necessary for the operations of its business and is in all respects in compliance therewith and with all statutes, laws, ordinances, rules and governmental regulations relating thereto. There are no proceedings pending or threatened which would result in the revocation, cancellation, suspension or any adverse modification thereof.

3.12    <u>Employees.</u>  A list of all the Company's employees are listed on Schedule 3.12.

3.13    <u>Contracts.</u>  Schedule 3.13 contains a complete and correct list as of the date hereof of all written agreements, contracts and commitments (and all amendments thereto) to which, as of the date hereof, the Company is a party or by which any of its assets or properties

are bound. The Seller and Shareholders have delivered to the Buyer complete and correct copies of all such written agreements, contracts and commitments, together with all amendments thereto, listed in Schedule 3.13. Except as specifically disclosed on Schedule 3.13, each such agreement, contract, commitment and lease is in full force and effect and no party is in default in the performance of its obligations thereunder.

3.14    Tax Returns and Payments. Except as set forth on Schedule 3.14, all tax returns and reports of the Company required by law to be filed (including without limitation income, property, sales, use, franchise, value added, withholding and social security taxes) have been duly and timely filed with the appropriate governmental agencies in all jurisdictions in which such returns and reports are required to be filed, and all taxes, assessments, fees and other governmental charges upon the Company, or upon any of its properties, assets, revenues, income or franchises which have become due and payable have been paid. Except as set forth on Schedule 3.14, neither the Internal Revenue Service ("IRS") nor any other taxing authority is now asserting or threatening to assert against the Company or Shareholders any deficiency or claim for additional taxes or interest thereon or penalties in connection therewith. Except as set forth on Schedule 3.14, the Company's Federal, state and local tax returns have not been audited by any federal, state or local taxing authority for any period subsequent to December 31, 2006 and the Company has not been assessed with any deficiencies and no proceeding is pending with respect to any proposed deficiency. Seller and Shareholders have heretofore delivered to Buyer true and correct copies of their Federal, state and local tax returns for its last three fiscal years.

3.15    Insurance. The Seller and Shareholders have delivered to the Buyer complete and correct copies of all policies or binders of insurance of which the Company is the owner, insured or beneficiary. A list of such policies, indicating for each policy the risks insured, amount of coverage, premium rate, cash value, if any, expiration date and any claims outstanding thereunder, is set forth on Schedule 3.15. All such policies and coverages are in full force and effect on the date hereof and all premiums have been paid. Such policies are in amounts and of such types as are customary in the trade or business of the Company.

3.16    Benefit Plans. The Company has no "employee pension benefit plans,11 as defined by Section 3(2) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and no liability with respect to any such plans.

3.17    Bank Accounts and Powers of Attorney. Schedule 3.17 sets forth the location of and the persons authorized to sign with respect to, each of the bank accounts of the Company or which relate to any of its respective assets, properties or business. Schedule 3.17 also sets forth, to the best knowledge of the Seller, a list of all Powers of Attorney granted by the Seller or the Company relating to the business and the operations of the Company, if any.

3.18    Disclosure. The Seller and Shareholders have furnished to Buyer every agreement, instrument, letter, pleading, consent, waiver, notice, note and every document of whatever nature relating to, and there is no other document or instrument of any kind that the Seller have failed to furnish that would or might affect the truth, accuracy or completeness of, its representations and warranties contained herein. No representation or warranty by the Seller or Shareholders in this Agreement nor any letter, financial or other statement or certificate

furnished or to be furnished to Buyer pursuant hereto, including the Schedules to this Agreement, contains or will contain any untrue statement of a material fact nor omits or will omit to state a material fact necessary to make the statements contained therein not misleading.

3.19    Corporate and Other Records.  The stock records of the Company are complete and accurate in all material respects, and its minute books contain an accurate record of (a) all Shareholders' and directors' meetings held and (b) all other corporate actions of the Shareholders and directors which were authorized.  The financial books and records of the Company have been maintained consistently in accordance with sound business practices and are accurate and complete in all material respects.

4.    Representations and Warranties of Buyer. The Buyer represents and warrants to the Seller as follows:

4.1    The Buyer acknowledges that the shares of the Corporation issued to the Buyer pursuant to this Agreement are not registered under the Securities Act of 1933, as amended (the "Securities Act"). The Buyer represents that he is acquiring the Shares with the intent of holding them for investment for his own account and without the intent of either participating directly or indirectly, in any offer or sale in connection with any distribution of such shares within the meaning of the Securities Act and the Buyer does not intend to divide his participation with others or to sell, assign or otherwise dispose of all or any part of his shares.

5.    Covenants of the Seller and Shareholders.

5.1    Access to Records.  Before the Closing Date, the Buyer and his accredited representatives shall have full access to the Company's books, accounts, and records of every kind, including, without limitation, balance sheets and income and operating statements, and Seller and Shareholders will furnish the Buyer with all additional financial and operating data and other information as to its business and properties that is from time to time reasonably requested.  Shareholders shall authorize and direct the Company's accountants to make available any information, including access to work papers, requested by the Buyer. Before the Closing Date, the Shareholders will insure that the Company engages in no transactions whatsoever without the prior written consent of the Buyer.

5.2    Further Assurances. Without further consideration, the Shareholders shall, and they shall direct and cause the Board of Directors and the officers of the Company to, at any time and from time to time through and after the Closing Date, execute and deliver to the Buyer such further documents and instruments or conveyance and transfer and shall take all such other and further action and cooperation as the Buyer shall reasonably request in order to convey and transfer more effectively to the Buyer the Shares and all other properties to be transferred to the Buyer and to consummate the transactions contemplated hereby. In addition, at the Buyer's request, the Shareholders will cooperate with the Buyer and the Company in the preparation of the Company's tax returns for the taxable year ended December 31, 2006

6.    Closing.  The Closing under this Agreement shall take place on March 12, 2007. The Closing shall occur if all conditions precedent set forth in the Agreement have been met or waived by the parties.

7.    Conditions to Obligations of the Buyer. Buyer's obligations hereunder are, at its election, subject to the conditions that, at or before the closing date:

7.1    Accuracy of Representations and Warranties. The representations and warranties of the Seller herein shall have been true and correct in all material respects on the date hereof and shall be true and correct in all material respects at and as of the Closing as though such representations and warranties were restated and made at and as of the Closing, except such representations and warranties as may be affected by the transactions contemplated hereby or as contemplated by this Agreement, and, at the Closing, the Seller shall each have executed and delivered to the Buyer and the Company a certificate to the foregoing effect.

7.2    Performance by the Seller. The Seller shall have transferred the Shares and otherwise duly performed and complied in all material respects with all terms, agreements, covenants and conditions required by this Agreement to be performed or complied with by each of it prior to or at the Closing and, at the Closing, the Seller and Shareholders shall each have executed and delivered to the Buyer a certificate to the foregoing effect.

7.3    Corporate Proceedings. All corporate and other proceedings in connection with this Agreement, and documents, opinions of counsel, and instruments incident hereto, shall be satisfactory in form and substance to the Buyer and its counsel, and Buyer and its counsel shall have received all such documents and instruments which they shall reasonably request, or copies thereof, certified if requested.

7.4    Opinion of Counsel for the Seller and Shareholders. The Buyer shall have received an opinion letter dated the Closing Date, reasonably acceptable to counsel for all parties.

7.5    Consents. The Seller shall have delivered to the Buyer all consents and authorizations listed in Schedule 3.5 which are required to be obtained at or prior to the Closing.

7.6    Resignations and Releases.  The Buyer shall have received the written resignations of all directors and officers of the Company effective as of the Closing.

7.7    Material Changes. Except as contemplated by this Agreement, there shall have been no actual or threatened changes, developments or the occurrence of contingencies in or relating to the business, prospects, affairs or financial condition of the Company that would or might have material, adverse effect on the business of the Company.

7.8    Absence of Liabilities. Delivery at Closing, of a statement certified by the President and Secretary of the Company, that as of such date the Company has no liabilities or obligations whatsoever, except as those listed in the Financial Statements or specifically referred

to in the Schedules.

8.    Indemnification

8.1    The Seller and each Shareholder severally, agree promptly to indemnify, defend and hold the Buyer and his respective successors and assigns, directors, members, officers, managers, Shareholders, employees and affiliates, harmless from, against and with respect to any and all claims, liabilities, losses, damages, costs and expenses (including reasonable attorneys' and accountants1 fees) arising out of, or related to,    (a) any failure, inaccuracy or breach by either Seller or the respective Shareholder of any representation, warranty, covenant, obligation, agreement or undertaking made by them in this Agreement, or in any certificate, schedule or financial statement delivered pursuant hereto, (b) any failure by a Seller or each respective Shareholder to perform any of his or her obligations, or (c) any legal, governmental or administrative action, suit or proceeding against the Buyer or his respective successors and assigns, directors, officers, employees and affiliates, which arise from the conduct of business of the Seller or each respective Shareholder's or the ownership or condition of the properties owned or leased by it prior to the Closing. (Each of the matters set forth in subparagraph (a), (b) and (c) above are hereinafter referred to as a "Claim"). The Buyer shall promptly notify the Seller and the respective Shareholder of any Claim for which indemnification may be required hereunder; provided, however, that the failure promptly to notify the Seller or Shareholders hereunder shall relieve them of their obligations hereunder in the event and only to the extent that such failure shall adversely affect the Seller or the respective Shareholder in connection with its obligations pursuant to this Section 8.1.  Any liability under this section 8.1 shall not exceed the amount invested in the Corporation by the Buyer.

8.2    Survival of Representations.  The covenants, representations, warranties and agreements of the parties contained in this Agreement shall survive the execution hereof and the Closing hereunder. No Claim for which indemnification may be sought shall be made after the end of three years from the date hereof; provided, however, that if a Claim has arisen and notice has been given as hereinabove provided prior to the end of such time, the party entitled to indemnification hereunder may continue to enforce its rights with respect to such Claim notwithstanding that such period has expired.

9.    Miscellaneous.

9.1    Notices.  All notices, requests, demands and other communications required or permitted hereunder shall be in writing and shall be deemed duly given when personally delivered or three (3) days after mailing if sent by certified mail, return receipt requested, postage prepaid, as follows, or to such other address or person as any party may designate by notice to the other party or parties hereunder:

9.2    Fees and Expenses.  The Seller, Shareholders and the Buyer shall each pay their own fees and expenses incurred in connection with the preparation, negotiation and consummation of this Agreement.  No such fees or expenses shall be charged to or paid by the Company.

9.3    Amendments; Termination.  This Agreement may not be changed or terminated orally and no waiver of compliance with any provision or condition hereof and no consent provided for herein shall be effective unless evidenced by an instrument in writing duly executed by the proper party. Termination pursuant to this Section shall be without prejudice to any rights and remedies of any party hereto pursuant to this Agreement or under applicable law, except as otherwise expressly provided herein.

9.4    Successors and Assigns. This Agreement may not be assigned by operation of law or otherwise.

9.5    Effect of this Agreement. This Agreement sets forth the entire understanding of the parties and supersedes any and all prior agreements, arrangements and understandings related to the subject matter hereof; provided, however,  that the Exhibits and schedules hereto and delivered herewith shall be deemed to be a part hereof.

9.6    Governing Law.  This Agreement and the legal relations between the parties hereto shall be governed by, and construed and enforced in accordance with, the laws of the State of New York.

a)    The parties consent to the jurisdiction of the Supreme Court of the State of New York and the United States District Court for the Southern District of New York for all purposes in connection with this Agreement.

b)    THE PARTIES HEREBY EXPRESSLY WAIVE ANY AND ALL RIGHTS THEY MAY HAVE TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION ARISING UNDER THIS AGEEMENT OR ANY AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR  IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS AGREEMENT, OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND THE PARTIES HEREBY AGREE AND CONSENT THAT ANY SUCH CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND A PARTY MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF EACH OF THEM TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

9.7    Captions. The captions used in this Agreement are for convenience of reference only and shall be given no substantive effect in the interpretation hereof.

9.8    Severability. The terms and provisions of this Agreement are intended to be severable in nature and the unenforceability of any term or provision hereof for any reason shall not serve to impair the enforceability of any other term or provision hereof.

9.9    Counterparts. This Agreement may be executed in any number of counterparts, all of which shall be considered one and the same instrument and shall become effective when one or more counterparts have been signed by each of the parties hereto and delivered to each of the other parties hereto.

9.10    Brokerage. Each of the parties represents that it has not dealt with any broker, or other party who may claim a commission in connection with the transactions contemplated hereby. It is agreed that if any other claims for brokerage commissions or fees are ever made against a party in connection with this transaction, all such claims shall be handled and paid by the party whose actions or alleged commitments form the basis of such claim and such party shall indemnify and hold harmless the others from and against any brokerage fees or agent's commissions or other compensation asserted by any person, form or corporation in connection with this Agreement or the transactions contemplated hereby. Nothing contained in this Section shall be used or construed or confer a benefit on or create a presumption in favor of any person not party to this Agreement.

9.11.    Parties Representation. At the direction of all parties this Agreement was drafted by the law firm of Silverberg Stonehill Goldsmith & Haber, P.C. The parties were advised and given the opportunity to consult with counsel or their own choosing. The parties acknowledge that said law firm represents Mr. Singh. Each party hereby waives and releases any claim they have, may have or could have against Silverberg Stonehill Goldsmith & Haber, P.C. arising out of or relating to or in connection with the drafting, preparation, negotiation and execution of this Agreement.

IN WITNESS WHEREOF, each party hereto has executed this Agreement as of the day and year first above written.

A.C.T. INTERNATIONAL APPAREL GROUP, INC.

By:
Title: PRESIDENT

EXHIBIT 3.6 (a)

FINANCIALS

# SCHEDULE 3.5

## CONSENTS

NONE

## SCHEDULE 3.6 (b)

## NO ADVERSE CHANGE

NONE

## SCHEDULE 3.6(c)

## ABSENCE OF UNDISCLOSED LIABILITIES

NONE

## SCHEDULE 3.7

## TITLE TO ASSETS

NONE

## SCHEDULE 3.8

## LEASES AND LICENSE AGREEMENTS

1. Florida Warehouse
2. Office Space Lease for 180 Madison Avenue, 20th Floor New York, New York
3. NASCAR License Agreement

## SCHEDULE 3.9

## LITITGATION

NONE

## SCHEDULE 3.10

## TRADEMARKS

NONE

## SCHEDULE 3.11

## COMPLIANCE WITH OTHER INSTRUMENTS AND LAWS

NONE

## SCHEDULE 3.12

## EMPLOYEES

1. Norman Moore
2. Sha Li
3. Dragana Lucevick
4. Sohondra Persaud
5. Traci Lopez
6. Mario Patram

## SCHDEULE 3.13

## CONTRACTS

1. Factoring Agreement with Merchant Factors
2. Lease and license agreement listed in previous schedules

## SCHEDULE 3.14

## TAX RETURNS AND PAYMENTS

NONE

## SCHEDULE 3.15

## INSURANCE

1.  Oxford Health Plan

## SCHEDULE 3.17

## BANK ACCOUNT AND POWERS OF ATTORNEY

## A.C.T. INTERNATIONAL APPAREL GROUP, INC.
## SHAREHOLDERS AGREEMENT

This agreement (the "Agreement") is made and entered into as of the 12th day of

March, 2007, by and among:

Norman Moore, residing at 11451 Fallow Deer Court, Fort Meyers, Florida 33966 ("Moore");

Sha Li, residing at 24 Warren Street, Plainsboro, New Jersey 08536 ("Li"); and

Karan Singh, residing at 31 Amber Lane, Oyster Bay, New York 11771 ("Singh");

 (each a "Shareholder" or collectively, the "Shareholders"); and

A.C.T. International Apparel Group, Inc., having a place of business at 180 Madison Avenue, 20th

Floor, New York, New York 10018 (the "Corporation") any other future owner and holder of shares

of the Corporation who may hereafter become a party to, or subject to, this Agreement.


W I T N E S S E T H :


WHEREAS, there are three thousand (3000) common shares of the Corporation

issued and outstanding, held as follows:

| Shareholder | Shares | Percentage |
|---|---|---|
| Norman Moore | 1000 | 33 1/3% |
| Sha Li | 1000 | 33 1/3% |
| Karan Singh | 1000 | 33 1/3% |

WHEREAS, the Shareholders hereto deem it to be in the best interest of the

Corporation to act together concerning the management and operation of the Corporation, as well as

031207

1

to make provision for the contingency of the death of any Shareholder and to set forth the manner and method by which a Shareholder may sell his shares during his lifetime;

NOW, THEREFORE, it is mutually agreed as follows:

FIRST:    MANAGEMENT AND OPERATION OF THE CORPORATION

A.    Directors

For the duration and term of this Agreement, the Shareholders will elect and continue in office as Directors of the Corporation, the following:

So long as Singh is a Shareholder of the Corporation two (2) designees of Singh, initially Karan Singh and Rajmattie Parsaud.

Li so long as she is a Shareholder of the Corporation.

Moore so long as he is a Shareholder of the Corporation.

B.    Officers

For the duration and term of this Agreement, the Officers of the Corporation shall be the following:

| | | |
|---|---|---|
| President | - | Karan Singh |
| Vice President | - | Norman Moore |
| Vice President of Production Secretary/Treasurer | - | Sha Li |

C.    Checks

All cash, checks and instruments for the payment of monies are to be deposited in the Corporation's bank account(s).  All checks drawn upon such account(s) are to be signed jointly by the President and countersigned by either the Vice President or the Secretary.

D.    Singh Loan

The parties acknowledge that simultaneously herewith, Singh has purchased one-third (1/3) of the issued and outstanding shares of the stock of the Corporation from the Corporation pursuant to a separate stock purchase agreement (the "Stock Purchase Agreement") by and among the Corporation and the Shareholders.  In addition to the purchase price for the shares, Singh has agreed to lend to the Corporation up to an additional Two Hundred Thousand Dollars ($200,000.00); provided, however, that if any such loan is made to the Corporation by Singh, the Corporation, Moore and Li each jointly and severally agree to indemnify and hold Singh harmless from any claim, cost and expense (including reasonable attorneys' fees) Singh may incur or sustain by reason of or arising out of the failure of the Corporation to repay said loan when due.

E.    Employment

1.    Each Shareholder shall be employed by the Corporation and each Shareholder agrees to devote his/her full time, attention, energy, efforts and services to the affairs and business of the Corporation and shall perform such services as may be assigned to such Shareholder by the Board of Directors.  In full compensation for all services the Shareholders may render to the Corporation, they shall each receive such salary and other remuneration as may be agreed to from time to time by the Board of Directors of the Corporation; provided, however, that:

031207

the initial compensation to be paid to each of the Shareholder employee of the Corporation shall be paid at the rate of One Hundred Fifty Thousand Dollars ($150,000.00) a year (the "Annual Base Compensation").

2.    In the event the Annual Base Compensation of Li and/or Moore is increased, then twenty-five percent (25%) of that increase shall be paid to or retained by the Corporation to offset and repay any loans such Shareholder may owe to the Corporation. As of the date hereof, it is acknowledged that Li owes the Corporation approximately One Hundred Eighty Thousand Dollars ($180,000.00) and Moore owes the Corporation approximately Two Hundred Sixty Thousand Dollars ($260,000.00).

3.    Anything contained herein to the contrary notwithstanding, in no event shall the compensation of the Shareholder employees be increased above One Hundred Fifty Thousand Dollars ($150,000.00) until the loan made by Singh referred to in the preceding paragraph "D" is repaid in full.

4.    In the event a Shareholder employee's employment with the Corporation terminates, then upon written notice to such Shareholder, the Corporation may cause such Shareholder to offer his/her entire stock interest for sale to the Corporation pursuant to Article "THIRD" (Lifetime Sale of Shares). Such notice by the Corporation to the terminated Shareholder employee shall be deemed an Offer Notice pursuant to Article "THIRD: A".

5.    In the event Moore or Li breach any material warranty, representation, covenant or agreement made by them in the Stock Purchase Agreement, Singh, shall have on written notice, the right to terminate the employment of the breaching party with the Corporation and cause the recipient to offer his/her entire stock interest in the Corporation for sale

031207

4

pursuant to Article "THIRD". Such notice by Singh shall be deemed an Offer Notice by the recipient pursuant to Article "THIRD: A" of this Agreement.

       F.    Loans and Insurance

          Anything contained in this Agreement to the contrary notwithstanding, in the event of a death of a Shareholder, any insurance proceeds collected by the remaining Shareholder or the Corporation on the life of the deceased Shareholder shall be applied in the following order of priority: (i) first, to satisfy and repay any loans owed by the Corporation to the deceased Shareholder (if the insurance proceeds are payable to or for the account of the remaining Shareholder, then such Shareholder shall purchase said loans from the decedent's estate without recourse to the extent of such insurance proceeds); (ii) second, to the payment of the purchase price for the shares of stock owned by the deceased Shareholder.

       G.    Restrictions

       1.    It is understood and agreed that no Shareholder shall engage in any other similar or dissimilar business or business activity, directly or indirectly, actively or passively, without the prior written approval of the Board of Directors. Notwithstanding the foregoing, nothing herein contained shall be construed to prohibit:

          (a)    All of the Shareholders engaging in joint enterprises; or

          (b)    A Shareholder engaging in activities or business not related to the business of the Corporation provided that such activities do not conflict or compete with, in any manner whatsoever, the business and activities of the Corporation, nor the duties of the Shareholder on behalf of the Corporation. Such activities shall be deemed not to be in conflict with the duties of the Shareholder hereunder if the Shareholder devotes no more than twenty (20) business

031207

days annually to such activities. Such activities may include serving as a member of the Board of Directors of unaffiliated companies and organizations and managing personal investments; or

(c)    Shareholder holding for investment only, not more than five percent (5%) of the stock of a corporation which is publicly traded on a recognized stock exchange or NASDAQ, provided that Shareholder shall not be otherwise active in the business of such corporation.

2.    For a period of twelve (12) months following the sale or other transfer of all of a Shareholder's Shares (the "Restricted Period"), no Shareholder shall, without first obtaining the written approval of the Board of Directors of the Corporation, directly or indirectly, as a principal, partner, stockholder, manager, member, owner, operator, participant, director, officer, consultant, financier, employee, agent or otherwise, engage in any business competitive with that of the Corporation. Each Shareholder acknowledges and agrees that his services to the Corporation are of a special and unique character and his position with the Corporation places him in a position of confidence and trust with the customers and suppliers of the Corporation. Each Shareholder recognizes that the Corporation's relationships with its customers and suppliers may therefore be placed in each Shareholder's hands and that the covenants and restrictions contained in this paragraph "G" are reasonable and necessary for the protection and maintenance of the national and international goodwill and the business of the Corporation. Each Shareholder acknowledges and agrees that the business of the Corporation, including the fact that the Corporation's suppliers and customers are located nationally and internationally, requires the broad scope of the area and time limitations set forth herein which are reasonable and properly required for the adequate protection of the business and goodwill of the Corporation. If the restrictions set forth in these provisions are

031207

6

found by any court of competent jurisdiction or any arbitration panel, as the case may be, to be unenforceable because it extends for too long of a period of time or over too great a range of activities or in too broad geographic area, it shall be interpreted to extend only to the maximum period of time, range of activities or geographic areas to which it may be enforceable. The so reduced restrictions shall remain in full force and effect. Each Shareholder and the Corporation have carefully considered the nature and extent of restrictions upon them and their rights and remedies confirmed upon them under this Agreement and hereby acknowledge that such restrictions, rights, and remedies: (i) are reasonable including, but not limited to, the term and geographic scope thereof, (ii) are designed to preclude competition which would be unfair to the Corporation, (iii) are clearly required to protect the legitimate business interests of the Corporation, and (iv) do not confer benefits upon the Corporation disproportionate to the detriment of the Shareholder. Each Shareholder acknowledges and agrees that the Corporation will be irreparably harmed if a Shareholder's obligations under the covenants are not specifically enforced, and the Corporation will not have an adequate remedy at law in the event of an actual or threatened breach or violation by a Shareholder of his obligations hereunder. Therefore each Shareholder agrees and consents that in additional to any and all other rights or remedies of the Corporation, the Corporation shall be entitled to an injunction for any actual or threatened violation or breach of the provisions of this paragraph "G" by such Shareholder without the necessity of the Corporation demonstrating that actual damages or monetary damages are inadequate and each Shareholder waives and relinquishes any right to require the Corporation post a bond or other security in connection with the enforcement of the provisions of this paragraph.

    3.  During the term of this Agreement and subsequent to the sale

031207

7

or other transfer of all of a Shareholder's Shares, no Shareholder shall, without first obtaining the written approval of the Board of Directors of the Corporation, directly or indirectly use for his own benefit or divulge, publish, cause to be published or disclose to any one outside of the Corporation, whether by private communication, public address, publication or otherwise (except to the extent such disclosure is necessary to perform his duties as a Shareholder, officer, director or employee of the Corporation), any Confidential Information (as defined herein) concerning the Corporation, its subsidiaries and affiliates and any other corporation, firm or person with whom the Corporation does business. All originals and copies of any Confidential Information, however and whenever produced, shall be the sole property of the Corporation and shall be surrendered to the Corporation upon the sale or other transfer of a Shareholder's Shares. For purposes of this Agreement, "Confidential Information" means information disclosed to a Shareholder or known by a Shareholder which is not generally known in the industry in which the Corporation is or may become engaged, about the Corporation's products, processes, and services, including information relating to the Corporation's research, development, inventions, manufacture, purchasing, accounting, engineering, marketing, merchandising and selling.

4.    Each of the Shareholders acknowledges and agrees that a breach by said Shareholder of any of the provisions that are contained herein will cause the Corporation irreparable injury and harm. Each of the Shareholders expressly agrees that notwithstanding anything contained in Article "THIRTEENTH" of this Agreement to the contrary, the Corporation shall be entitled to injunctive or other equitable relief to prevent the Shareholder's breach of this Agreement. Resort to such equitable relief, however, shall not be construed to be a waiver of any other rights or remedies that the Corporation may have pursuant to this Agreement.

031207

8

SECOND:    DEATH OF A SHAREHOLDER

A.    Offer

In the event of the death of a Shareholder, the legal representative of decedent's Estate shall be required to give the Corporation and the other Shareholder with notice of his appointment (the "Appointment Notice" and shall be required to sell all of decedent's shares of the Corporation and he shall be deemed to have offered said shares as follows:

1.    First to the other Shareholder who agrees to purchase as many of said shares as may be purchased with the proceeds of the insurance insuring the life of the deceased Shareholder payable to the other Shareholder or to or for the account of the other Shareholder, which proceeds are in excess of the loan account required to be purchased pursuant to Article "FIRST: F".

2.    Then to the Corporation, which agrees to purchase all or as many of said shares as it may legally purchase, and to give notice in writing of the amount of such shares that it will purchase within thirty (30) days from the date of Appointment Notice.

B.    Acceptance

The offer shall be deemed accepted by the other Shareholder to the extent possible by the proceeds of life insurance payable to the other Shareholder or for his benefit, which proceeds are in excess of any loans which the remaining Shareholder is required to purchase pursuant to Article FIRST: F of this Agreement. The Corporation shall be deemed to have accepted the offer to purchase the balance or as many shares as it may legally purchase. In the event

031207

9

that the Corporation is unable to legally purchase all of such shares, the surviving Shareholder shall

have the option to be exercised by written notice to the Corporation, and the estate representative

within thirty (30) days after the Appointment Notice to purchase those shares of the decedent's stock

not purchased with insurance proceeds or by the Corporation.

C.    Purchase Price

The purchase price for decedent's shares shall be as hereinafter

set forth in Article "FOURTH".

D.    Closing

Closing shall be held at the office of the attorney for the

Corporation on a date and time to be mutually agreed upon, but no later than sixty (60) days after the

Appointment Notice, whichever is later. Article "SIXTH" of this Agreement sets forth the manner of

payment and the documents to be executed and delivered at closing.

E.    Life Insurance

1.    In order to provide the Shareholder(s) with funds to

purchase the shares of a deceased Shareholder and to purchase or repay any loans the deceased

Shareholder lent to the Corporation, each Shareholder may apply for and own life insurance on the

life of the other Shareholder. Any such insurance contracts shall be listed in Schedule "A" annexed

hereto. Each Shareholder agrees to pay the premiums as they become due on the insurance policies

owned by him. Each policy shall be the sole and absolute property of the owner, provided, however,

that the owner hereby collaterally assigns the policies owned by him to the insured herein as security

only for the performance by the owner of the obligations on his part to be performed under this

Agreement. If any premiums shall remain unpaid five (5) days before the end of the grace period, the

031207

10

insured may pay or cause the premium to be paid and shall be entitled to reimbursement from the owner. Any dividends upon the policies prior to maturity or death of the insured shall be paid to the owner in cash or disposed of as the owner may choose to direct. This Agreement shall extend to and include all additional life insurance policies to be listed in Schedule "A" and any other insurance policy owned by a Shareholder on the life of any other Shareholder.

2.    In the event of the death of a Shareholder, the surviving Shareholders shall have the option to purchase the insurance policy or policies on his own life by paying to the Estate of the decedent within six (6) months after the latter's decease or the Appointment Notice, an amount equal to the interpolated terminal reserve value. In the event of a purchase of stock hereunder for any reason other than the decease of a Shareholder, then at any time within ninety (90) days after the purchase shall have been consummated by the delivery of stock and notes as provided herein, the non-selling Shareholder shall have the right to purchase the insurance policy or policies on his own life owned by the selling Shareholder by paying to the selling Shareholder an amount equal to the interpolated terminal reserve value of such policy. Upon the termination of this Agreement, each Shareholder may at his option, within thirty (30) days, purchase any policies of life insurance on his own life owned by the remaining Shareholder(s) for a price equal to the interpolated terminal reserve value of such policies.

3.    Upon the death of a Shareholder, the beneficiary shall promptly collect the proceeds of the policies of life insurance on the life of the deceased Shareholder and hold same In Trust, separate and apart from his other assets, solely for the purposes of repaying or purchasing decedent's loans to the Corporation and purchasing decedent's shares of the Corporation and, as such Trustee, shall, subject to the provisions of this Agreement, turn over the

031207

11

same to the legal representative of the Estate of the deceased Shareholder immediately upon his

appointment, as payment on account for the decedent's shares and loans. The proceeds of such

insurance shall be applied to the purchase of decedent's loans and the balance, if any, to purchase the

shares of the Corporation owned by the decedent. In the event the purchase price for the decedent's

loans and shares, as hereinafter determined, does not exceed the net proceeds of the insurance, then

and in such event, the legal representative of the deceased Shareholder shall retain the amount

received from the Trustee as payment in full for the decedent's loans and shares which shares shall be

endorsed and delivered to the surviving Shareholders together with appropriate tax waivers. In the

event the purchase price for the shares and the outstanding balance on the loan account exceeds the

net proceeds of insurance actually collected by the Trustee on the decedent's life, then and in such

event, the balance of the purchase price shall be paid as hereinafter provided. It is the express

intention of the parties that the amount of insurance collected by the Corporation and/or other

Shareholder on the decedent's life, in excess of the loan accounts, shall at all times constitute the

minimum purchase price to be paid for the shares of the deceased Shareholder.

### 4.    Failure to Purchase

In the event the surviving Shareholder does not

purchase, and the Corporation is not legally able to purchase, all or part of said shares and the

surviving Shareholder fails or refuses to purchase all or the balance of such shares as hereinbefore

provided and such failure or refusal continues for a period of twenty (20) days after written notice by

the legal representative of the deceased Shareholder to the Corporation and the surviving

Shareholder, the parties do hereby agree that the Corporation shall and will be liquidated and

dissolved forthwith and all salaries of all Officers and Directors shall immediately cease and the net

031207

proceeds of liquidation shall be distributed to each Shareholder or their legal representative, pro rata to their stock interest in the Corporation, however the decedent's estate shall receive not less than all insurance proceeds received from life insurance policies owned by the surviving Shareholder(S) on the decedent's life.

5.    Default

If the Corporation defaults in payment after acceptance, and said default in payment continues for a period of ten (10) days after notice in writing thereof from the legal representatives of the deceased to the Corporation and surviving Shareholder(s), then, and in such event, the Corporation shall be liquidated and dissolved forthwith, all salaries of all Officers and Directors shall immediately cease, the balance of the purchase price for the decedent's shares to the extent accepted by the Corporation shall be paid out of the first proceeds of liquidation after payment in full of the liabilities of the Corporation, and the accepting party or parties shall remain liable for any resulting deficiency and shall be required to pay the difference between the purchase price and the net amount realized by the decedent's Estate from the liquidation of the Corporation.

THIRD:    LIFETIME SALE OF SHARES

A.    Restriction of Sale

No Shareholder shall sell, transfer, pledge, hypothecate or assign or in any way encumber or dispose of all or any portion of his shares except by sale to the Corporation or the other Shareholders, as herein provided.

031207

13

1. <u>Offer</u>

In the event a Shareholder desires to dispose of his shares in the Corporation, he shall offer, in writing, all of his shares to the Corporation, and the other Shareholders, at the purchase price set forth herein. The Corporation shall have the first option to purchase as many of the shares as it can legally purchase. If the Corporation cannot legally purchase all of the shares or fails to indicate acceptance of the offer in writing within twenty (20) days from the receipt of the offer, then the remaining Shareholder shall have the option to purchase all or the remaining balance of said shares. The remaining Shareholder, if he desires to purchase the shares as offered, shall indicate his acceptance in writing to the offeror within thirty (30) days after the receipt of the original offer.

2. <u>Purchase</u>

The purchase price shall be as stated in Article "FOURTH" of this Agreement.

3. <u>Closing</u>

Closing shall be held no later than sixty (60) days after the end of the calendar month in which the offer to sell was made or ten (10) days after the determination of the purchase price, whichever is later, and shall take place at the office of the attorney for the Corporation at a time to be mutually agreed upon between the parties. At closing, the selling Shareholder shall deliver to the Purchaser(s) his shares duly endorsed for transfer, together with his resignation as an Officer, Director and Employee of the Corporation. With respect to any insurance policies insuring the life of the selling Shareholder (the "Policies") the following shall apply.

(a)    At such time as remaining Shareholder(s) fail to pay the

031207

14

premiums on the Policies or indicate that they do not wish to maintain the Policies, the selling

Shareholder, before or after Closing, shall have the right on sixty (60) days written notice to the

Corporation and other Shareholders(s), to purchase the Policies for the interpolated terminal reserve

value of such Policies.

(b)    In the event of the death of the selling Shareholder prior

to payment in full for his shares, the unpaid balance of the purchase price shall be accelerated and

prepaid to the extent of the insurance proceeds collected by the other Shareholder or, the Corporation

from the Policies.  In the event the Corporation is the purchaser of said shares; the remaining

Shareholder shall contribute the capital of the Corporation or lend to the Corporation such portion of

the insurance proceeds they receive on the life of a selling Shareholder to the extent of all such

proceeds, if necessary, so that the Corporation shall prepay the balance of the purchase price to the

extent of insurance proceeds collected from the Policies.  The insurance proceeds collected in excess

of the unpaid balance of the purchase price shall be retained by and remain the property of the owner

of the Policy.

(c)    At such time as the purchase price for the selling

Shareholder's shares is paid in full, the selling Shareholder shall have the right on sixty (60) days

written notice to Corporation and the other Shareholders to purchase the Policies of his life.  The

purchase price for the Policies shall be the interpolated terminal reserve value of such policies.

B.    Payment

Payment shall be made pursuant to and under the terms and conditions

of Article "SIXTH" of this Agreement.

031207

15

C.    Failure to Purchase

In the event the Corporation is not legally able to purchase or does not purchase all or part of said shares and the remaining Shareholder(s) fail or refuse to purchase all or the balance of such shares, as hereinbefore provided, and such failure or refusal continues for a period of thirty-five (35) days after the original written notice of offer to sell, then, the parties do hereby agree that the Corporation shall and will be liquidated and dissolved forthwith, that all salaries of all Shareholders, Officers and Directors shall immediately cease, and the net proceeds of liquidation shall be distributed to each Shareholder, pro rata to his interest in the Corporation.

D.    Default

If either the Corporation or the remaining Shareholder(s) default in payment after acceptance, and said default in payment continues for a period of ten (10) days after notice in writing thereof from the Seller, then the Corporation shall be liquidated and dissolved forthwith, all salaries of all Shareholders, Officers and Directors shall immediately cease, the purchase price for the Seller's shares shall be paid out of the first proceeds of liquidation after deducting or paying all liabilities of the Corporation, and the accepting party or parties shall remain liable for any resulting deficiency and shall be required to pay the difference between the purchase price and the amount realized by the Seller after liquidation.

E.    Death of Offeror

1.    In the event of the death of the Offeror prior to acceptance, then such death shall be deemed a revocation of the offer to sell and the provisions of Article "SECOND", "DEATH OF A Shareholder" shall apply.

2.    Anything contained in this Agreement to the contrary

031207

16

notwithstanding, in the event of the death of the offering Shareholder prior to closing, then the minimum purchase price to be paid for the shares of stock of such offering Shareholder shall be the insurance proceeds in excess of the loans due the deceased Shareholder by the Corporation received by the Corporation and/or the remaining Shareholder from insurance policies listed in Schedule "A" annexed hereto.

FOURTH:    PURCHASE PRICE

A.    The purchase price of a deceased or selling  Shareholder's shares in the Corporation shall be the book value of the decedent's shares as of the end of the month in which the death of the Shareholder shall occur or the Offer Notice was given or deemed given (the "Calculation Date"); provided, however, in the event of the death of a Shareholder, the purchase price shall not be less than the amount of life insurance proceeds, if any, collected by the other Shareholders and/or the Corporation on the life of the deceased Shareholder pursuant to this Agreement in excess of the balance of any unpaid loans the deceased or selling Shareholder made to the Corporation.  Anything contained herein to the contrary notwithstanding, in the event of a lifetime sale of shares by Moore or Li during the two (2) year period from the date hereof, in determining the purchase price for their shares, the book value of the Corporation shall be reduced by Three Hundred Thousand Dollars ($300,000.00).

B.    Anything contained in this Agreement to the contrary notwithstanding, it is understood and agreed that the economic interest in the Corporation of the Decedent or the selling Shareholder terminates as of the Calculation Date used to determine the purchase price for the Shareholder's interest being purchased.  Neither the selling Shareholder nor

031207

17

the legal representative of the deceased Shareholder shall be entitled to participate in any profits or losses of the Corporation which accrue subsequent to the Calculation Date nor shall the selling Shareholder nor the legal representative of a deceased Shareholder be entitled to any dividends or other distributions with respect to the profits of the Corporation which accrue subsequent to the Calculation Date. Any dividends received by the legal representative of the deceased Shareholder or the selling Shareholder on account of profits, which accrue subsequent to the Calculation Date shall be deemed payments on account of the purchase price. The purchase price for the shares of the selling or deceased Shareholder shall bear interest from the Calculation Date to the date of Closing at the rate set forth in paragraph "SIXTH: A".

FIFTH:          CALCULATION OF PURCHASE PRICE

A.    In calculating the book value of the shares of the Corporation, the following shall be applied.

1.    Goodwill, trade names, trademarks and other intangible assets shall be deemed of no value unless acquired for a valuable consideration in which event the cost of acquisition, less amortization, if any, shall be applied.

2.    Merchandise inventory shall be taken in the presence of a representative of the selling Shareholder and remaining Shareholders, and shall be valued at the lower of cost or market.

3.    Furniture, fixtures and other equipment shall be valued at the book value thereof, as of the date of calculation.

4.    Cash in bank or on hand shall be taken at face value.

031207

18

5.    Accounts receivable shall be taken at their net value after allowing for all customary discounts and reasonable reserves in the light of actual prior experience and practice.

6.    All other assets, if any, carried on the books of account of the Corporation, shall be taken at their appraised value.

7.    There shall be deducted from the aggregate of the foregoing assets of the Corporation all liabilities as of the date of calculation, including, but not limited to, any and all accrued wages, vacation pay (whether or not accrued), commissions or bonuses to salesmen, employees or others.

8.    There shall also be deducted (with out duplication) all taxes of every kind, nature and description, whether imposed by Federal, State or Municipal authorities, which then shall be due and payable or which thereafter may become payable by the Corporation for any periods prior to the date of calculation.

9.    Appropriate reserves shall be created to reflect bad debts and any accrued or contingent tax or other liabilities as the accountant for the Corporation may determine to be reasonable and necessary.

10.    The proceeds of any life or disability insurance policies collected upon the death of the Shareholder whose shares are being evaluated shall not be deemed an asset of the Corporation and life insurance policies owned by the Corporation on the lives of the Shareholders shall be valued as an asset at no more than their cash surrender value.

B.    In the event any of the parties to a sale of shares objects to the determination of the book value found by the corporate accountant, as herein provided, the objecting

031207

19

party shall notify the other parties hereto of such objection within ten (10) days after the receipt of

the determination of the corporate accountant. In the event of an objection, the objecting party shall

designate his own accountant at his own cost and expense to make such determination in accordance

with the terms of this Agreement. If the accountant so designated by the objecting party and the

accountant for the Corporation do not agree upon the book value within fifteen (15) days after

objection, the dispute shall be referred to a third accounting firm designated by both accountants

within three (3) days after such fifteen (15) day period. If both accountants fail to agree on such third

accounting firm, then the parties agree to have the American Arbitration Association select such a

firm of independent accountants in New York City to arbitrate the matter, and the actual adjustment

to Schedule "B" or the book value as found by the arbitrating firm shall be final and binding upon all

the parties hereto.


SIXTH:    MANNER OF PAYMENT

A.    Deferred Payment

That portion of the purchase price of the shares of a deceased

Shareholder in excess of the proceeds of insurance, if any, shall be paid as follows: twenty percent

(20%) of the purchase price at closing and the balance in twenty-four (24) equal, consecutive,

monthly installments. The purchase price of the shares of a selling Shareholder shall be paid as

follows: twenty-five percent (25%) of the purchase price at closing, and the balance in twenty-four

(24) equal, consecutive, monthly installments. Such deferred payments shall commence on the later

of: (i) one (1) month after closing; or (ii) two (2) years from the date hereof; and shall be evidenced

by a negotiable promissory note(s) bearing interest at the rate of seven percent (7%) per annum and

031207

20

providing for acceleration in the event of default continuing ten (10) days after written notice of default. If under the Internal Revenue Code of 1986, as amended, or the regulations thereunder, interest would be imputed on the installments of the purchase price in excess of the interest rate provided in this Agreement, then, at the time each installment is due, the purchaser will pay such installment together with interest on such installment at the lowest rate (compounded as required) necessary to avoid such imputation of interest. The maker shall have the right to prepay all or any of said notes in the inverse order of their maturity without premium or penalty provided interest is paid to date of payment.

B.    Escrow

Upon the receipt of the purchase price in full or in cash and notes, as hereinbefore provided, the Trustees on behalf of the legal representative of the deceased or disabled Shareholder or the selling Shareholder, as the case may be, shall deliver the certificates for such shares (and all related documents), together with an executed standard form General Release in favor of the Corporation and the remaining Shareholder(s) relating to the selling Shareholder's position as a Shareholder, office, employee and director of the Corporation, to the attorney for the Corporation, who shall hold all such certificates and General Release in escrow to secure payment therefor, until all of the unpaid balance has been received and collected by the Seller, at which time he shall deliver them to the purchaser(s). The shares shall be duly endorsed to the purchaser and have appropriate tax transfer stamps affixed thereto. The purchaser shall have all rights of ownership during the time the shares are held in escrow and shall be entitled to vote said shares, and shall be entitled to receive any dividends or other emoluments so long as the purchaser is not in default under the terms of this Agreement.

031207

21

C    Default

1.    Upon default in payment of the notes, the seller shall have all rights of a secured party under the applicable provisions of the Uniform Commercial Code concerning Secured Transactions, as then in effect under the laws of the State of New York, which rights are incorporated herein by reference.  The sole obligation of the Escrowee is to produce the escrowed shares and general releases at the public or private sale held pursuant to said Code provision.  The Escrowee shall not have any liability except for fraud or gross negligence.

2.    In addition to the foregoing, if the Corporation is the purchaser and there is a default in payment of any notes and said default in payment continues for a period of ten (10) days after notice in writing thereof from the seller, then the Corporation shall be liquidated and dissolved forthwith, all salaries of all Shareholders, Officers and Directors shall immediately cease, the purchase price for the seller's shares shall be paid out of the first proceeds of liquidation after deducting or paying all liabilities of the Corporation.

D    Additional Items at Closing

1.    The legal representative of a deceased Shareholder shall be required to deliver an appropriate tax waiver and a Certificate of Letters Testamentary or Letters of Administration to the attorney for the purchaser upon receipt of the purchase price in full or in cash and notes as provided in "B" above.

2.    All credit cards and corporate property of the selling or deceased Shareholder shall be delivered to the Corporation.  Seller shall agree to indemnify the Corporation against any unknown and/or unauthorized charges on such cards or property.

031207

22

E.    Loans

Any loans owed to the Corporation by the deceased or selling Shareholder shall be paid to the Corporation out of the first monies received on the sale of the shares hereunder, and any loans owed to the deceased or selling Shareholder by the Corporation shall be paid at the time of closing.

F.    Restrictions

During the period in which all or any part of the purchase price for shares in a Company remains unpaid, the Corporation shall not (i) increase the aggregate remuneration, either directly or indirectly, to the remaining Shareholders, in excess of $200,000 per annum, unless an amount equal to one-third (1/3) of any payments in excess of $200,000 shall be paid to the Decedent's estate or the Selling Shareholder, as the case may be, as a prepayment of the unpaid purchase price to be applied against the unpaid installments of the purchase price in inverse order of their due date, or (ii) take any action outside the usual normal course of its regular and customary business, without first obtaining the consent of the legal representative of the Decedent's estate or the Selling Shareholder of such Company, as may be the case.  Such consent shall not be unreasonably withheld or delayed and shall be deemed consented to if no written rejection is given within ten (10) days of the request for consent.

G.    Termination of Guarantees and/or
Security Arrangements made by
Shareholders or Affiliated Parties

At the Closing, any and all guarantees then outstanding made by a selling Shareholder or by any related or affiliated party of a selling Shareholder, as the case may be, for the benefit of the Corporation, and all of the outstanding obligations of such guarantor or

guarantors pursuant thereto, shall be terminated and be of no further force or effect from and after the Closing hereunder. The Corporation shall use its best efforts and take all such action and execute and deliver to any person, institution or entity, which shall have advanced funds and/or extended credit to the Corporation by reason of any such guarantee made by the deceased or selling Shareholder or a related or affiliated party or parties of the selling Shareholder, as the case may be, such instruments or documents as shall be necessary to cause any such guarantee to be terminated and at an end and the guarantor(s) to be released from any and all claim or liability thereunder.

SEVENTH:    CORPORATE SURPLUS

In the event the Corporation shall not have sufficient surplus to permit it to lawfully purchase the deceased or selling Shareholder's shares, the surviving Shareholder(s) and the seller may promptly take such lawful measures (if any such measures are available) as may be appropriate or necessary in order to enable the Corporation to lawfully purchase and pay for seller's shares, including, by way of illustration and not by way of limitation, a current appraisal of the assets of the Corporation to determine whether a reappraisal surplus is available.

EIGHTH:    TAX LIABILITY

A.    Acceptance by the seller of all or part of the purchase price upon a "LIFETIME SALE OF SHARES", pursuant to Article "THIRD" of this Agreement, shall constitute an Agreement by the seller to indemnify the Corporation and its remaining Shareholders from and against any and all claims or liabilities of the Corporation which may arise subsequent to the date of closing with respect to taxes of any kind or nature found to be due to the United States or

031207

24

any State or Municipality for any periods prior to closing. It is understood and agreed that the liability of the selling Shareholder shall be limited to such proportion as is equivalent to his proportionate interest in the Corporation prior to closing.

B.    Seller shall be entitled to prompt notification by the Corporation of any and all notices of claims and shall have the right, at his sole cost and expense, to participate in any proceeding, legal or otherwise, with respect to such claim or liability.

C.    The indemnification provided for herein shall be a continuing one and shall survive closing.

NINTH:    ACTION IN VIOLATION OF THIS AGREEMENT

A.    In the event the shares of any Shareholder are transferred or disposed of in any manner without complying with the provisions of this Agreement, or if such shares are taken in execution or sold in any voluntary or involuntary legal proceeding, execution, sale, bankruptcy, insolvency or in any other manner, the Corporation and the other Shareholders shall, upon actual notice thereof, in addition to their rights and remedies under this Agreement, be entitled to purchase such shares from the Transferee thereof, under the same terms and conditions set forth in Article "THIRD" of this Agreement, as if the Transferee had offered to sell such shares, but in no event shall the purchase price exceed the amount paid for the said shares by the Transferee, if such shares were acquired by the Transferee for consideration. The Corporation may, at its option, refuse to transfer on its books and records any shares transferred in violation of this Agreement.

B.    Any Shareholder who shall commence any proceedings or who shall petition any court for the dissolution of the Corporation, other than pursuant to the specific right

031207

to cause the Corporation to be liquidated and dissolved as provided in this Agreement, shall be deemed to have offered his shares for sale under the same terms and conditions set forth in Article "THIRD" of this Agreement.

TENTH:    ILLEGALITY

A    If any provision of this Agreement shall be determined by the arbitrators, or any court having jurisdiction, to be invalid, illegal or unenforceable, the remainder of this Agreement shall not be affected thereby, but shall continue in full force and effect as though such invalid, illegal or unenforceable provision or provisions were not originally a part hereof.

B.    This Agreement shall be construed and enforced in accordance with the laws of the State of New York.

ELEVENTH: TERMINATION

This Agreement shall remain in full force and effect for as long as two (2) of the Shareholders are shareholders of the Corporation, or until the adjudication of the Corporation as a bankrupt or dissolution of the Corporation.

TWELFTH:    WAIVER

No waiver or modification of any of the provisions of this Agreement or of any of the rights or remedies of the parties hereto shall be valid unless such change is in writing, signed by the party to be charged therewith. No waiver of any of the provisions of this Agreement shall be deemed a waiver of any other provision.

031207

26

THIRTEENTH:    GOVERNING LAW

A.    The parties consent to the jurisdiction of the Supreme Court of the State of New York and the United States District Court for the Southern District of New York for all purposes in connection with this Agreement.

B.    THE PARTIES HEREBY EXPRESSLY WAIVE ANY AND ALL RIGHTS THEY MAY HAVE TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION ARISING UNDER THIS AGEEMENT OR ANY AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS AGREEMENT, OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND THE PARTIES HEREBY AGREE AND CONSENT THAT ANY SUCH CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND A PARTY MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF EACH OF THEM TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

C.    Anything to the contrary herein notwithstanding, since

the shares of the Corporation cannot be readily purchased or sold on the open market and the parties will be irreparably damaged in the event this Agreement is not specifically enforced, should any dispute concerning the sale or disposition of any of the shares of the Shareholders occur, a temporary restraining order or injunction may be obtained from a court of appropriate jurisdiction, restraining any sale or disposition of said shares, pending the determination of such controversy, pursuant to the arbitration provision of this Agreement. In addition to the foregoing, any of the parties may apply to any court of appropriate jurisdiction for any of the provisional remedies to which such party may be entitled under the laws of the State of New York, including, but not limited to, injunction, attachment or replevin, pending the determination of any claim or controversy pursuant to the arbitration provision of this Agreement.

FOURTEENTH:     SURVIVAL

This Agreement shall bind the parties hereto and their respective heirs, administrators, executors, successors and assigns.

FIFTEENTH: ENDORSEMENT

All share certificates of the Corporation shall contain an endorsement stating that such shares are subject to the terms and provisions of this Agreement.

SIXTEENTH: NOTICES

Any notice required to be given under this Agreement shall be sent by Registered or Certified Mail, Return Receipt Requested, to the respective addresses of the parties as

031207

28

contained in the records of the Corporation, or if no later addresses appear in the records of the Corporation, then to the addresses first above stated.

SEVENTEENTH:    CONSTRUCTION OF TERMS

As used in this Agreement, wherever necessary or appropriate the singular shall be deemed to include the plural and vice versa, and the masculine gender shall be deemed to include the feminine and vice versa, as the context may require.

EIGHTEENTH:    REVOCATION

The parties hereto revoke and cancel all prior Shareholder Agreements by or among or between them.

NINETEENTH:    PARTIES REPRESENTATION

At the direction of all parties this Agreement was drafted by the law firm of Silverberg Stonehill Goldsmith & Haber, P.C. The parties were advised that they should obtain separate representation. The parties acknowledge that said law firm represents Mr. Singh. Each party hereby waives and releases any claim they have, may have or could have against Silverberg Stonehill Goldsmith & Haber, P.C. arising out of or relating to or in connections with the drafting, preparation, negotiation and execution of this Agreement.

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals the day, month and year first above written.

031207

**A.C.T. INTERNATIONAL APPAREL GROUP, INC.**

By _____

_____
Norman Moore

_____
Sha Li

_____
Karan Singh

# SCHEDULE "A"

## THE FOLLOWING LIFE INSURANCE POLICIES ARE SUBJECT TO THIS AGREEMENT

| NAME OF INSURED | INSURANCE COMPANY | POLICY NUMBER | BENEFICIARY | AMOUNT |
| --- | --- | --- | --- | --- |

031207

# A.C.T. INTERNATIONAL APPAREL GROUP, INC.
## UNAINMOUS WRITTEN CONSENT
## OF THE SHAREHODLERS
## AND DIRECTORS

The undersigned being all the shareholders and directors and A.C.T. International Apparel Group, Inc., a New Jersey corporation having an address at 180 Madison Avenue, New York, New York 10018 (the "Corporation") hereby adopt the following resolutions by written consent in lieu of a meeting as of the 12th day of March, 2007.

RESOVED, that the following individuals are designated as directors of the Corporation to serve for a term of one (1) year or until his respective successors are designated and qualified:

| Norman Moore | Sha Li |
|---|---|
| Karan Singh | Rajmattie Parsaud |

RESOLVED, that the following individuals are designated as officers of the Corporation to serve for a term of one (1) year or until his respective successors are designated and qualified:

| NAME | TITLE |
|---|---|
| Karan Singh | President |
| Norman Moore | Vice President |
| Sha Li | Vice President of Production/Secretary/Treasurer |

RESOLVED, that the Corporation adopt and agree to be bound by and any officer of the Corporation is hereby authorized to sign on behalf of the Corporation, a certain Stock Purchase Agreement by and among the Corporation, Norman Moore, Sha Li, and Karan Singh dated March 12, 2007.

RESOLVED, that the Corporation adopt and agree to be bound by and any officer of the Corporation is hereby authorized to sign on behalf of the Corporation, a certain Shareholders Agreement by and among the Corporation, Norman Moore, Sha Li and Karan Signh dated March 12, 2007.

RESOLVED, that the officers and directors of the Corporation are hereby authorized and directed to sign and deliver such documents and take such other action as may be reasonable or necessary to implement this resolution and said agreements.

RESOLVED, that the officers and directors of the Corporation are hereby authorized to take any such action necessary to implement the foregoing resolutions.

IN WITNESS WHEREOF, the undersigned being all the shareholders and directors of the Corporation have signed this consent as of the 12th day of March 2007.

_____
Karan Singh

_____
Norman Moore

_____
Sha Li